# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

HENRY WILLIAMS,                     :          CIVIL NO. 1:CV-01-2271
                                    :
    Plaintiff                :
                                    :
    v.                       :          (Judge Conner)
                                    :
ROBERT S. BITNER, et al.,           :
                                    :
    Defendants                :

## MEMORANDUM

Before the court is defendants' motion to dismiss plaintiff's amended complaint (Doc. 21). Plaintiff, Henry Williams ("Williams"), is an inmate incarcerated in the State Correctional Institution at Rockview, Pennsylvania ("SCI-Rockview"), who adheres to the Islamic faith. (Doc. 19). He was terminated from his position as cook in the prison kitchen for refusing to serve pork, an act that violates his religion. Id. Plaintiff brings suit pursuant to 42 U.S.C. § 1983 under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc to 2000cc-5, and the First and Fourteenth Amendments to the United States Constitution against the following officers of the Pennsylvania Department of Corrections ("DOC"): DOC Chief Hearing Examiner Robert Bitner ("Chief Examiner Bitner"), DOC Hearing Examiner Jay Stidd ("Hearing Examiner Stidd"), SCI-Rockview Superintendent Robert Meyers ("Superintendent Meyers"), SCI-Rockview Deputy Superintendent Terry Whitman ("Superintendent Whitman"), Program Review Committee ("PRC")

(Attachment)

Member Robert Kerstetter ("PRC Member Kerstetter"), PRC Member G.P. Gaertner ("PRC Member Gaertner"), PRC Member Frank Tennis ("PRC Member Tennis"), SCI-Rockview Prison Captain George Snedeker ("Captain Snedeker"), Culinary Food Service Supervisor Gary Emel ("Supervisor Emel"), and Culinary Food Service Instructor Scott Wyland ("Instructor Wyland").  (Doc. 19).

Defendants move the court to dismiss plaintiff's amended complaint on the following grounds: (1) RLUIPA is unconstitutional, (2) defendants are entitled to qualified immunity, (3) defendants did not impose a substantial burden on plaintiff's exercise of his religious beliefs in violation of RLUIPA, and (4) Chief Examiner Bitner, Superintendent Meyers, Superintendent Whitman, PRC Member Kerstetter, PRC Member Gaertner, and PRC Member Tennis did not participate in the alleged deprivation of plaintiff's rights.  (Doc. 21).  The motion has been briefed by the parties and is now ripe for disposition.

I.    **Background**

Plaintiff, who is of the Islamic faith, states that the Holy Qu'ran directs Muslims not to consume swine and to "refrain from assisting others to consume swine." (Doc. 19 ¶¶ 15-16, 19).  Williams further claims that "Islamic scholars also endorse Chapter Eleven of Leviticus in the Old Testament regarding prohibition of adherents from handling swine." Id. ¶ 17.  In February 2001, SCI-Rockview staff assigned plaintiff to work as a cook in the prison kitchen, with the proviso that he

2

could work another assignment every other Saturday when the staff served pork for lunch. Id. ¶¶ 21-22.

On Saturday, March 3, 2001, Williams reported to work. (Doc. 19 ¶ 24). The kitchen staff planned to serve hot cakes for breakfast and roast pork for lunch. Id. ¶ 27. Plaintiff cooked hot cakes at the outset of his shift. Id. ¶ 28. The head cook inmate then instructed Williams to perform other kitchen tasks that did not involve the rationing of pork. Id. ¶ 29. However, the kitchen staff suffered from a shortage of cooks on this day and Instructor Wyland directly ordered Williams to ration the pork lunch. Id. ¶¶ 26, 30. Plaintiff refused on the grounds that both the Bible and the Qu'ran prohibited him from helping others to consume pork. Id. ¶ 33.

When plaintiff refused to obey, Instructor Wyland's immediate supervisor, Supervisor Emel, issued plaintiff another direct order to ration the pork lunch. Plaintiff also refused to obey this order. Id. ¶¶ 32-34. Supervisor Emel immediately fired Williams from the kitchen position and advised Instructor Wyland to issue Williams a misconduct for failure to follow a direct order. Id. Subsequently, Captain Snedeker reviewed and approved the decision to issue this misconduct. Id. ¶ 36.

On March 6, 2001, SCI-Rockview staff conducted plaintiff's misconduct hearing. (Doc. 19 ¶ 38). Prior to the hearing, plaintiff submitted a written defense, citing federal caselaw suggesting that a correctional institution cannot force a Muslim to serve pork. Id. ¶¶ 37-39. Additionally, Williams requested that Hearing

3

Examiner Stidd summon the prison's Muslim chaplain. Williams sought the chaplain's testimony to establish that the Islamic faith required plaintiff to abstain from assisting others to eat pork. Id. ¶ 37. Hearing Examiner Stidd denied Williams's request and allegedly disregarded the cited federal caselaw. Id. ¶ 40. Hearing Examiner Stidd found plaintiff not guilty of refusing to work but guilty of refusing to obey an order and sanctioned plaintiff to thirty days of cell restriction.[1] Id. ¶ 42-43. Williams appealed the decision to the Program Review Committee ("PRC").[2] Id. ¶ 43.

On March 15, 2001, PRC Members Gaertner, Tennis, and Kerstetter reviewed Hearing Examiner Stidd's decision. (Doc. 19 ¶ 45). They sustained his conclusion, finding that Muslim inmate kitchen workers can ration pork since they are required to wear gloves and therefore technically do not touch pork. (Doc 31, Ex. 16). Plaintiff's subsequent appeals from the PRC decision to Superintendent Meyers[3] and Chief Examiner Bitner were denied.

---

[1] The cell restriction caused plaintiff to miss all but one religious observance per week. As a result, plaintiff was unable to participate in the annual Islamic festival of Id. At the time defendants issued the misconduct, plaintiff was working toward a Certification in Arabic Studies. Because of the cell restriction, plaintiff missed the class more than three times, thus forfeiting the certification and was unable to call his mother following her dental surgery due to his cell confinement. (Doc. 19 ¶ 54).

[2] Plaintiff also filed grievances regarding this matter. (Doc. 19 ¶ 52). On March 12 and 14, 2001, the grievance coordinator rejected the complaints, finding that DOC policy prohibits prisoners from filing grievances on matters related to a pending misconduct sanction. Id. ¶ 53.

[3] In his opinion, Superintendent Meyers also stated that "the Bible is inapplicable to Muslims, in the opinion of the Superintendent." (Doc. 19).

4

Defendants discharged Williams from cell restriction after he had served twenty-seven days of the thirty-day sentence and reassigned him to serve as janitor in the kitchen, a position that provided less compensation than a cook. Id. ¶ 55. Following his reassignment, Instructor Wyland allegedly told Williams that he should be grateful since Instructor Wyland could no longer ask him to work directly with pork. Id. ¶ 57. SCI-Rockview staff placed the misconduct in his institutional disciplinary record, and raised his security classification from low to medium. Id. ¶ 59.

In November 2001, Williams filed the complaint in the case *sub judice*, asserting claims under § 1983 for violations of RLUIPA and the First and Fourteenth Amendments to the United States Constitution. (Doc. 19). Defendants filed a motion to dismiss the amended complaint, arguing, *inter alia*, that RLUIPA is unconstitutional. (Doc. 21). With court approval, the United States and the Beckett Fund for Religious Liberty filed briefs in support of RLUIPA's constitutionality. (Docs. 34, 40).

## II.   **Standard of Review**

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of a claim that fails to assert a basis upon which relief can be granted. FED. R. CIV. P. 12(b)(6). When deciding a motion to dismiss for failure to state a claim, the court is required to accept all factual allegations in the complaint and reasonable inferences therefrom.

5

Langford v. City of Atlantic City, 235 F.3d 845, 847 (3d Cir. 2000) (citing Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996)). "The complaint will be deemed to have alleged sufficient facts if it adequately put[s] the defendant on notice of the essential elements of the plaintiff's cause of action." Id. The court will not dismiss a complaint for failure to state a claim unless it appears beyond a doubt that "no relief could be granted under any set of facts that could be proved consistent with the allegations." Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514 (2002).

"In determining whether a claim should be dismissed under Rule 12(b)(6), a court looks only to the facts alleged in the complaint and its attachments without reference to other parts of the record." Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994). However, the court may consider "undisputedly authentic document[s] that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the [attached] document[s]." Pension Benefit Guar. Corp. v. White Consol. Ind., 998 F.2d 1192, 1196 (3d Cir. 1993). The court must grant leave to amend before dismissing a complaint that is merely deficient. See Shane v. Fauver, 213 F.3d 113, 116-17 (3d Cir. 2000).

**III.   Discussion**

To prevail in a § 1983 action, the plaintiff must demonstrate that a person acting under color of state law violated a right secured under the Constitution or laws of the United States. See 42 U.S.C. § 1983; Nicini v. Morra, 212 F.3d 798, 806 (3d

Cir. 2000); Schiazza v. Zoning Hearing Bd., 168 F. Supp. 2d 361, 372 (M.D. Pa. 2001).

In this case, defendants move the court to dismiss plaintiff's § 1983 claims on several

grounds:  (1) RLUIPA is unconstitutional,[4] (2) defendants are entitled to qualified

immunity, (3) defendants did not impose a substantial burden on plaintiff's exercise

of his religious beliefs in violation of RLUIPA, and (4) several defendants did not

participate in the alleged deprivation of plaintiff's rights.

A.   **Constitutionality of RLUIPA**

Section 2000cc 1(a) of the Religious Land Use and Institutionalized Persons

Act ("RLUIPA"), pertaining to prison inmates, provides as follows::

> No government shall impose a substantial burden on the religious
> exercise of a person residing in or confined to an institution, as defined
> in section 1997 of this title, even if the burden results from a rule of
> general applicability, unless the government demonstrates that
> imposition of the burden on that person--
> (1) is in furtherance of a compelling governmental interest; and
> is the least restrictive means of furthering that compelling
> governmental interest.

42 U.S.C. § 2000cc-1(a).  An act of Congress is presumed constitutional, and a court

should invalidate a statute only if Congress clearly exceeded its enumerated powers

in passing the legislation.  United States v. Morrison, 529 U.S. 598, 607 (2000).

---

[4] When evaluating a § 1983 claim, the court must first "identify the exact contours of the underlying right said to have been violated" and determine "whether the plaintiff has alleged a deprivation of a . . . right at all."  Nicini, 212 F.3d at 806 (citing County of Sacramento v. Lewis, 523 U.S. 833, 841 n.5 (1998)).  Hence, the court must initially address a claim of unconstitutionality before turning to the merits of a § 1983 claim.

7

Utilizing this deferential standard, the court will address defendants' various

arguments that RLUIPA violates the Establishment Clause,[5] the Tenth Amendment,

and the Eleventh Amendment, and that Congress, in enacting the statute, exceeded

its authority under the Spending and Commerce Clauses.  Id.

      **1.**    **Establishment Clause**

Defendants first charge that RLUIPA is unconstitutional under the

Establishment Clause of the First Amendment to the United States Constitution

because the Act advances religion.  (Doc. 25).  In assessing whether a government

action violates the prohibition against any "law respecting an establishment of

religion," courts apply the three-prong test articulated in Lemon v. Kurtzman, 403

U.S. 602 (1971).  See Corp. of the Presiding Bishop of the Church of Jesus Christ of

Latter-Day Saints v. Amos, 483 U.S. 327, 334 (1987); Am. Civil Liberties Union of N.J.

v. Schundler, 104 F.3d 1435, 1440 (3d Cir. 1997).  The Lemon test requires that

government actions (1) have "a secular legislative purpose," (2) have a "principal or

primary effect" that "neither advances nor inhibits religion," and (3) do not "foster

excessive government entanglement with religion."  Lemon, 403 U.S. at 612-13

(internal quotation marks and citations omitted).

---

[5] The clauses of the First Amendment encompassing the freedom of religion
are known as the Establishment Clause and the Free Exercise Clause.  Together they
read as follows: "Congress shall make no law respecting an establishment of religion,
or prohibiting the free exercise thereof . . . ."  U.S. CONST. amend. I.

The secular-purpose element of the Lemon test does not require that Congress act with complete indifference to religion, but mandates only that its main goal not be to support a particular viewpoint. See Amos, 483 U.S. at 335. "[I]t is a permissible legislative purpose . . . to alleviate significant governmental interference with the ability of religious organizations to define and carry out their religious missions." Id. Congress enacted RLUIPA to reduce governmental obstruction of incarcerated persons' exercise of religion, see 146 CONG. REC. E1563 (extension of remarks July 14, 2000) (statement of Rep. Canady), not to promote a particular religious point of view or religion in general. See Amos, 483 U.S. at 335; Mayweathers v. Newland, 314 F.3d 1062, 1068 (9th Cir. 2002). Neither the legislative history nor the language of the statute supports the conclusion that Congress acted with the goal of advancing a religious agenda. See id. As the Supreme recognized in Amos, ensuring fair treatment for *all* individuals, regardless of belief, is a valid secular objective. Accordingly, the court finds that RLUIPA does not violate the first element of the Lemon test.

The second prong of Lemon precludes government actions that, regardless of intent, have the primary effect of advancing religion. Lemon, 403 U.S. at 612-13. Like the purpose element, this prong is not violated by legislation that merely reduces government interference with religious practices or incidentally assists a certain organization. Rather, only those actions that substantially further a particular

9

viewpoint breach this obligation.  While defendants challenge RLUIPA on the

ground that it provides greater protection than is constitutionally required, the

Supreme Court has repeatedly held that "'[t]he limits of permissible state

accommodation to religion are by no means co-extensive with the noninterference

mandated by the Free Exercise Clause.'"  Amos, 483 U.S. at 334 (quoting Walz v. Tax

Comm'n of City of New York, 397 U.S. 664, 673 (1970)).  RLUIPA merely ensures that

all inmates share an equal right to observe their beliefs, if they so choose.  Simply

put, lowering of barriers does not equal endorsement of a cause.  The Act does not

violate Lemon's second prong.[6]

    Like the other two elements, the entanglement prong of the Lemon test focuses

on avoiding the appearance that government supports a particular religious

_____

    [6] In further support of their argument that RLUIPA violates the second
prong of Lemon, defendants cite to Texas Monthly, Inc. v. Bullock, 489 U.S. 1 (1989)
(plurality opinion), and Estate of Thornton v. Caldor, Inc., 472 U.S. 703 (1985).  In
Texas Monthly, the Supreme Court invalidated a Texas statute exempting
periodicals published or distributed by religious organizations from the state's sales
tax because the "subsidy" could not but "convey a message of endorsement."  489
U.S. at 5.  In Caldor, the Supreme Court struck down as impermissibly advancing
religion a statute that required employers to retain employees who refused to work
on the Sabbath.  472 U.S. at 710.
        Texas Monthly and Caldor are distinguishable from the present matter in
several aspects.  Unlike the statutes at issue in those cases, which accorded special
benefits to religious organizations, RLUIPA merely accommodates observances by
removing state-imposed burdens on inmates' free exercise of religion.  The statutes in
Texas Monthly and Caldor granted an unfettered right to persons with certain
religious practices, regardless of the countervailing interests of other entities or
individuals.  Id. at 709-710.  In contrast, RLUIPA addresses the countervailing
interests of prison administrators by allowing the government to burden inmates'
religious freedom, provided this burden serves as the least restrictive means to
achieve a compelling governmental interest.  See 42 U.S.C. §§ 2000cc to 2000cc-5.

viewpoint. Violations of this prohibition generally occur when government provides

subsidies for a particular cause, see Comm'n for Public Educ. & Religious Liberty v.

Nyquist, 413 U.S. 756, 782-83 (1973), or engages in oversight of religious professionals,

see Meek v. Pittenger, 421 U.S. 349, 385-90 (1975). In contrast, actions that limit

interference with religious practice clearly do not "entangle" government with

religion. Rather, they effectuate a more complete separation of church and state.

See Amos, 483 U.S. at 335. By removing state interference with inmates' religious

freedom, RLUIPA furthers the goal of the Establishment Clause, and, for this reason,

the Act does not violate the third prong of the Lemon test. Hence, the court holds

that RLUIPA does not violate the Establishment Clause of the United States

Constitution.

2.    **Tenth Amendment**

Defendants next contend that RLUIPA violates the Tenth Amendment

because it impermissibly controls Pennsylvania's sovereign power to regulate its

prisons. (Doc. 25). The Tenth Amendment to the United States Constitution

provides that "[t]he powers not delegated to the United States by the Constitution,

nor prohibited by it to the States, are reserved to the States respectively, or to the

people." U.S. CONST. amend. X. While this provision prevents the federal

government from "controlling" state legislatures through congressional command, it

does not preclude Congress from inducing state action through the promise of federal

11

funding.   Legislation enacted pursuant to the Spending Clause does not violate the Tenth Amendment because states may choose whether to accept the conditions concomitant with acceptance of federal funds.  See South Dakota v. Dole, 483 U.S. 203, 210-11 (1987); see also Mayweathers, 314 F.3d at 1069.  RLUIPA applies only to those "program[s] or activit[ies] that receive[] Federal financial assistance," see 42 U.S.C. § 2000cc(a)(2), and, as such, states may avoid the Act's requirements by refusing federal aid.  Thus, the statute does not impermissibly "control" state legislatures in violation of the Tenth Amendment to the United States Constitution.

### 3.   Eleventh Amendment

Defendants also assert that RLUIPA is unconstitutional because it abrogates Pennsylvania's Eleventh Amendment immunity.  The Eleventh Amendment precludes private litigation against the states and their respective agencies absent their consent.  Kimel v. Fla. Bd. of Regents, 528 U.S. 62, 73 (2000); Hans v. Louisiana, 134 U.S. 1, 15 (1890).  However, notwithstanding the Eleventh Amendment, federal courts have jurisdiction to hear suits seeking non-monetary relief, including prospective injunctive relief against state officials who violate federal law.  Ex parte Young, 209 U.S. 123 (1908).  In accordance with this exception to Eleventh Amendment immunity, RLUIPA permits plaintiffs to seek injunctions against official conduct that interferes with religious practices.  Because the Act does not mandate

12

the award of damages, it does not unconstitutionally abrogate the immunity granted by the Eleventh Amendment.[7]

### 4.    Spending Clause

Finally, defendants argue that Congress, in enacting RLUIPA, exceeded its constitutional power under the Spending Clause.  Article I of the United States Constitution, which empowers the federal government to "lay and collect Taxes . . . and provide for the . . . general Welfare," grants Congress broad authority to condition the receipt of federal funds on compliance with federal statutes and administrative directives that further national policy objectives.  U.S. CONST. art. I, § 8, cl. 1; Fullilove v. Klutznick, 448 U.S. 448, 474 (1980).  However, this power is limited by the requirement that the conditions imposed be both unambiguous and reasonably related to the purpose of the expenditure.[8]  Dole, 483 U.S. at 207-08.

Defendants first argue that RLUIPA's requirements are unconstitutionally ambiguous because the statute places undisclosed conditions on previously

---

[7] An exception to Ex parte Young applies when the court action threatens to affect a unique or essential attribute of state sovereignty.  Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 289 (1997); MCI Telecomm. Corp. v. Bell Atlantic-PA, 271 F.3d 491, 508 (3d Cir. 2001).  While states clearly possess an important interest in the management of their prisons, this interest is not "tied in a unique way to sovereignty," so as to preclude application of Ex parte Young.  Coeur d'Alene, 521 U.S. at 286; see also Alabama v. Pugh, 438 U.S. 781 (1978) (allowing inmates' Ex parte Young suit against prison officials to go forward); Spicer v. Hilton, 618 F.2d 232 (3d Cir. 1980) (permitting district court to entertain request for injunctive relief directed at appropriate state officials).

[8] The Spending Clause also requires that the legislation not violate any independent constitutional prohibitions.  The court has addressed these issues previously in this opinion, see supra Part III.A, and will not repeat the analysis here.

13

dispersed federal funds. (Doc. 25). Congress is required to state unambiguously the conditions for receipt of federal funds because "there can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it." Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1, 17 (1981). Although defendants contend that RLUIPA, in mandating compliance by any "program or activity that receives" federal funding, constitutes a new and undisclosed condition on previously dispersed funds, nothing in the language of RLUIPA suggests that Congress will impose the statute's conditions retroactively. See 42 U.S.C. §§ 2000cc to 2000cc-5. Congress has not acted to recall funding previously allocated to states, but, ostensibly, will act to remove entitlement only *prospectively* if a state decides to avoid the statutory requirements.

Defendants further assert that the terms "compelling governmental interest" and "least restrictive means" are too ambiguous to afford the states adequate notice of the conditions of federal funding. (Doc. 25). While RLUIPA does not explicitly define these phrases, the United States Supreme Court has developed the meaning of both terms through years of Free Exercise Clause jurisprudence. See e.g., Church of Lukumi Babalu Aye, Inc. v. City of Hileah, 508 U.S. 520, 546 (1993). Government officials must frequently conform their conduct to these constitutional standards, and should be familiar with their requirements. Hence, the court holds that RLUIPA does not constitute undisclosed conditions on previously dispersed federal funds.

14

Defendants also argue that federal grants to the DOC are unrelated to

facilitating or protecting a prisoner's right to exercise his or her religion, and, thus,

the statute is not a valid exercise of the spending power.[9] Although conditions for

the receipt of funding "must . . . . bear some relationship to the purpose of the federal

spending," those conditions need only relate to the general purpose of the funding

project, not to the specific purpose of the statute in question. See New York v.

United States, 505 U.S. 144, 167 (1992). In other words, so long as the conditions

comport with the overall goal of the federal funding program, the statute will be

considered a valid exercise of the Spending Clause. In this case, defendants concede

that the federal government provides funds to state correctional institutions in order

to assist in the rehabilitation of inmates. Presumably, prisoners derive rehabilitative

benefits from the exercise of their religion. see 139 CONG. REC. S578 (daily ed. Oct. 27,

1993) (statement of Sen. Hatch) ("[E]xposure to religion is the best hope we have for

rehabilitation of a prisoner."), and Congress clearly has a legitimate interest in

ensuring that no federal funds are used to facilitate unnecessary interference with

inmates' free exercise of religion. See Mayweathers, 314 F.3d at 1067. Thus, the court

---

[9] The Pennsylvania DOC receives approximately $202.6 million per year in federal aid. (Doc. 8).

15

finds that RLUIPA does not exceed congressional power under the Spending Clause.[10]

Because RLUIPA represents a valid exercise of Congress's authority as granted by the Spending Clause to the United States Constitution and does not infringe upon the Establishment Clause, Tenth Amendment, or Eleventh Amendment, the court finds RLUIPA constitutional.

### B.   Qualified Immunity

Next, defendants contend that they are entitled to qualified immunity with respect to plaintiff's claim under § 1983 for violations of the First Amendment.  (Doc. 25).  Qualified immunity protects government officials performing discretionary functions from suit provided they have not violated "clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).[11]  Thus, an official may defeat a § 1983 claim by showing either that no violation actually occurred or that the right was not clearly established at the time of the alleged violation.  Saucier v. Katz, 533 U.S. 194, 201 (2001); Harlow, 457 U.S. at 818.

---

[10] Because the court finds RLUIPA to be a valid exercise of Congress's power under the Spending Clause, the question of whether the Act exceeds congressional authority under the Commerce Clause is moot.

[11] Qualified immunity would protect defendants only from liability for monetary damages under Williams's First Amendment claim.  See Harlow, 457 U.S. at 818 n.34.

Defendants contend that their decision to fire plaintiff for refusing to handle pork did not violate his First Amendment right to free exercise of religion.[12] (Doc. 25). In analyzing claimed violations of an inmate's religious freedom, four elements are relevant to the reasonableness of the challenged regulation: (1) whether a valid, rational connection exists between the challenged prison regulation and a legitimate government interest, (2) whether the inmate possesses alternative means of exercising the right at issue, (3) whether the costs of accommodating the right in question on other inmates and prison staff exceed the benefits to the aggrieved person, and (4) whether alternatives exist that fully accommodate the inmate's rights at a *de minimus* cost to valid penological interests. Turner v. Safley, 482 U.S. 78, 91 (1987). Assuming that the first two considerations militate in their favor,[13] defendants' actions fail to meet the final two prongs of the Turner test. The prison staff's previous willingness to accommodate plaintiff's avowed aversion to pork by transferring him to another assignment when pork was served shows that defendants could meet plaintiff's needs without prohibitive costs. Furthermore, courts have previously required prisons to accommodate Muslim inmates by preparing

---

[12] Defendants do not challenge the sincerity of plaintiff's religious belief. See Africa v. Pennsylvania, 662 F.2d 1025, 1029-30 (3d Cir. 1981).

[13] Cf. DeHart v. Horn, 227 F.3d 47, 54 (3d Cir. 2000) (holding that prison had valid interest in maintaining single menu and that Buddhist prisoner, who was denied a vegetarian diet, possessed alternative means of exercising his religion, including prayer, worship, meditation, and scripture study).

17

alternative meals on days in which pork is served, a mandate that clearly creates a greater burden than rearranging a kitchen work schedule. See Muslim v. Frame, 854 F. Supp. 1215, 1224 (E.D. Pa. 1994) (holding that Muslim inmates are entitled to receive alternative foods whenever an institution serves pork). Thus, defendants cannot claim qualified immunity on the ground that no constitutional violation has been presented.

Defendants also claim entitlement to qualified immunity on the ground that the violation was not so "clearly established" that prison officials should be expected to avoid it. Although neither the United States Supreme Court nor the Third Circuit has directly addressed whether prison officials can require a Muslim inmate to serve pork, courts within this jurisdiction have held that Muslim inmates are entitled to a pork-free diet, see Muslim, 854 F. Supp. at 1224; Masjid Muhammad-D.C.C. v. Keve, 479 F. Supp. 1311, 1318 (D. Del. 1979), and several other circuits[14] have recognized a Muslim inmate's right to refrain from handling pork, see Hayes v. Long, 72 F.3d 70, 73-74 (8th Cir. 1995) (finding that Muslim inmates had a clearly established right to refrain from handling pork for purposes of a qualified immunity analysis); Kenner v. Phelps, 605 F.2d 850, 851 (5th Cir. 1979) (finding that Muslim inmates' claim that they were forced to handle pork stated cause of action). Further, in this case, plaintiff attempted to inform SCI-Rockview officials of his right to refrain from handling pork,

---

[14] When reviewing a qualified immunity defense, courts should examine their own *and* other relevant precedents. Elder v. Holloway, 510 U.S. 510, 516 (1994).

requested the presence of the institutional Muslim chaplain at his disciplinary hearing, and referred the hearing examiner to federal appellate caselaw supporting his position.  In these circumstances, the court finds that plaintiff's right to refrain from handling pork was clearly established at the time of the alleged violation and will deny defendants' motion to dismiss on qualified immunity grounds.

C.   **Plaintiff's Claim Under RLUIPA**

Defendants argue that the motion to dismiss should be granted because their decision to terminate plaintiff's employment in response to his refusal to handle pork did not impose a substantial burden on his religious freedom in violation of RLUIPA. (Doc. 25).  See 42 U.S.C. § 2000cc-1.  Because the standard for a breach of constitutional provisions is more rigorous than that under RLUIPA, compare Turner, 482 U.S. at 91 (stating that no violation exists if official action was related to a "legitimate" interest), with 42 U.S.C. § 2000cc-1 (providing that no violation exists only if official action was related to a "compelling" interest), a complaint that establishes a prima facie Free Exercise violation is necessarily sufficient to present a valid claim under RLUIPA.  Based on the prior discussion of plaintiff's First Amendment claim in the context of the qualified immunity analysis, the court finds that plaintiff has established a RLUIPA claim upon which relief could be granted.

19

D.   **Supervisory and Administrative Defendants**

Finally, defendants move for the dismissal of several individuals[15] on the ground that they played no direct role in the alleged constitutional violation. (Doc. 25). Although plaintiffs cannot generally base § 1983 claims on a theory of *respondeat superior*, see Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988), the court finds this issue better suited for resolution after development of the factual record, in the context of a motion for summary judgment. Therefore, the court will deny defendants' motion to dismiss the supervisory and administrative defendants.

E.   **Conclusion**

For the foregoing reasons, defendants' motion to dismiss will be denied. An appropriate order will issue.

        S/ Christopher C. Conner
        CHRISTOPHER C. CONNER
        United States District Judge

Dated:      September 30, 2003

---

[15] PRC Members Kerstetter, Gaertner, and Tennis; Superintendent Meyers; Superintendent Whitman; Hearing Examiner Stidd; Captain Snedeker; and Chief Examiner Bitner. (Doc. 25).