**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ROBERT T. SMITH,** | : | |
| | : | |
| **Plaintiff** | : | |
| | : | **CIVIL NO. 1:CV-03-0898** |
| **vs.** | : | |
| | : | **(JUDGE VANASKIE)** |
| **KENNETH KYLER, et al.,** | : | |
| | : | |
| **Defendants** | : | |

**M E M O R A N D U M**

**I.        Introduction**

        Robert T. Smith, an inmate at the State Correctional Institution at Huntingdon

("SCI-Huntingdon"), Huntingdon, Pennsylvania, filed this pro se action to seek injunctive relief

under 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act

("RLUIPA"), 42 U.S.C. § § 2000cc et seq..  Smith, a Rastafarian, alleges that Defendants

violated his free exercise and equal protection rights, as well as rights accorded to him under

RLUIPA, by denying his requests for weekly group prayer service led by a prayer leader.

Named as defendants are Kenneth Kyler, the former Superintendent of SCI-Huntingdon, and

Ray Earlston, the former Facility Chaplaincy Program Director at SCI-Huntingdon.[1]  Presently

before the Court is Defendants' motion for summary judgment.  Because the undisputed facts

---

        [1] At the present, the Superintendent at SCI-Huntingdon is James L. Grace, and the
current Facility Chaplaincy Program Director is the Rev. George D. Koharchick.  (See Dkt.
Entry 66, Brief in Support of Defendants' Motion for Summary Judgment.)

of record show that Defendants have not imposed a substantial burden on Plaintiff's exercise of religion and have not otherwise violated his constitutional rights, the motion will be granted.

## II.    Statement of Facts

Pursuant to DC-ADM 819, <u>Religious Activities</u>, the Department of Corrections ("DOC") has established a policy and procedure for accommodating inmates' religious practices.  (Dkt. Entry 67, Defendants' Revised Statement of Material Undisputed Facts ("DSMF") at ¶ 1; Dkt. Entry 66-2 at R. 11.)[2]  For the major faith groups within a facility, the DOC will hire a full or part-time chaplain or contract with a religious leader to conduct religious services.  (DSMF at ¶ 7; Klemm Decl. at ¶ 9.)  The DOC has either hired a chaplain as a DOC employee, or contracted with religious leaders, to provide Catholic, Protestant, Muslim and Native American services for inmates at SCI-Huntingdon.  Approximately 60 Catholics, 125 Protestants, 175 Muslims, and 25 Native Americans regularly attend weekly religious services at SCI-Huntingdon.  (DSMF at ¶ 10; Klemm Decl. at ¶ 9.)

The DOC does not have the financial resources to pay for faith group leaders for those inmate religious groups which consist of a few inmates.  (DSMF at ¶ 14.)  Smaller religious groups may obtain the services of a volunteer faith group leader.  The volunteer religious leader must provide all services, programs, education, and other assistance at his or

---

[2]  The designation "R" followed by a page number references CM/ECF pagination of the document cited.

her own cost.  (DSMF at ¶¶ 11-12; Dkt. Entry 66-2, DC-ADM 819 at RR. 12 and 13; Klemm

Decl. at ¶ 10.)  The following religious services are provided by a volunteer religious leader at

SCI-Huntingdon free of charge to the DOC:  Jewish services that are regularly attended by

approximately 12 inmates; Jehovah Witnesses services attended regularly by approximately 7

inmates; Buddhist services attended regularly by approximately 6 inmates; and a Messianic

Jewish group service regularly attended by approximately by 15 inmates.  (DSMF at ¶¶ 15-16;

Klemm Decl. at ¶ 11.)  Additionally, the DOC allows each inmate to designate a Religious

Advisor who may meet with that inmate personally.  Visits from a Religious Advisor do not

count as a regular visit.  (Dkt. Entry 66-2, DC-ADM 819 at R. 17.)

    In order to obtain approval and arrange for a religious service for a new religious

group, the DOC requires an inmate to submit an Inmate Religious Accommodation Form, also

known as a DC-52, to the Facility Chaplaincy Program Director ("FCPD").  (DSMF at ¶ 12; see

also Dkt. Entry 66-2 at R. 22, DC-52.)  An inmate is also encouraged to obtain written

information from his or her outside faith group, including any publications that describe the

goals, beliefs, and practices of the faith group, and supply this information to the FCPD.

(DSMF at ¶ 18; see also Dkt. Entry 66-2 at R. 18.)  The Religious Accommodation Review

Committee considers each inmate's request for a group religious service and forwards a

recommendation to the appropriate Regional Deputy Secretary.[3]  (DSMF at ¶ 19.)  The

Regional Deputy Secretary approves or disapproves the request and then notifies the Director

of the Bureau of Inmate Services of the decision.  (DSMF at ¶ 21.)  The Director of the Bureau

of Inmate Services then informs the Facility Manager and the FCPD of the requesting facility of

the determination and ensures copies of all final determinations are provided to all Deputy

Secretaries and Facility Managers.  (DSMF at ¶ 22.)  The FCPD informs the affected inmate of

the determination.  If the request will not be accommodated, the inmate may then file a

grievance in accordance with the DOC Grievance Policy, DC-ADM 804.  (DSMF at ¶ 23; see

also Dkt. Entry 66-2 at R. 19.)  Grievances may only be submitted after the inmate has received

notification of the decision on the requested accommodation.  (Dkt. Entry 66-2 at R. 19.)

Rev. Ulrich Klemm, the DOC Administrator for Religion and Volunteer Services,

sits on the Religious Accommodation Review Committee.  (Klemm Decl. at ¶ 1 and ¶ 13.)  He

has asserted that the DOC is aware of only two other inmates besides Plaintiff, Henry Dennison

and Jerald Bradley, who have filed DC-52 forms requesting Rastafarian services at SCI-

Huntingdon.  (DSMF at ¶¶ 24 - 26; see also Dkt. Entry 66-2 at RR. 26 and 29.)  Both requests

were forwarded to the Religious Accommodation Review Committee and denied.  (DSMF at ¶

---

[3]  The Religious Accommodation Review Committee is comprised of various Religious
Faith Group Leaders and Central Office staff (i.e. Security, Medical, Food Services, etc.).
(DSMF at ¶ 20.)

24 and ¶ 27.)[4]

As the number of inmates who formally requested Rastafarian services at SCI-Huntingdon is so small, the DOC would consider providing a weekly Rastafarian service only if a volunteer religious leader would be willing to offer such a service at its own expense, and if space and appropriate supervision were available.  (DSMF at ¶ 28.)  A Rastafarian chaplain, Abunda A. Foxe ("Bishop Foxe"), employed by the New York Department of Corrections, advised SCI-Huntingdon officials in April of 2003, that he was willing to travel to SCI-Huntingdon if the DOC would pay his unspecified travel expenses.  (Klemm Decl. at ¶ 16; DSMF at ¶ 29.)  Payment of travel expenses, including meals and lodging, is inconsistent with DOC policy.  As the Rastafarian inmates have not identified a religious leader who is willing to serve as a volunteer free of charge, the DOC has refused to accommodate the request for weekly Rastafarian services.  (DSMF at ¶ 31.)

In short, the request for weekly services under the direction of a prayer leader has been denied because there has been insufficient interest by SCI-Huntingdon inmates to

---

[4] Plaintiff has submitted affidavits of 33 SCI-Huntingdon inmates who express an interest in attending regularly-held Rastafarian services.  (Plaintiff's Response to Defendants' Reply Brief, Dkt. Entry 83, R. at 6-39.)  Only four of the inmates, however, have asserted that they requested Rastafarian services, but had not received a response to their request from DOC "Religious Advisors."  (Dkt. Entry 83, R. at 7, 29, 34, and 39.)  Only one of these four persons states that his request was in writing.  None of the four indicate when their requests were made, and none of the affidavits indicates that the request was made on a DC-52 form in accordance with the applicable policy statement.

warrant the expense of paying for such services and a volunteer leader has not come forward. Defendants maintain that the refusal to provide at DOC expense the religious leader necessary to conduct group Rastafarian services does not abridge rights under RLUIPA or the United States Constitution.

### III.   Standard of Review

Summary judgment will be granted if the record establishes that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).  In considering a summary judgment motion, inferences from the underlying facts must be viewed in the light most favorable to the non-moving party.  P.N. v. Clementon Bd. of Educ., 442 F.3d 848, 852 (3d Cir. 2006).

Rule 56(c) imposes a burden on the moving party to point to an absence of evidence supporting the nonmoving party's case.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  Once the moving party has met this burden, the burden then shifts to the non-moving party.  The party opposing summary judgment "may not rest upon the mere allegations or denials of the . . . pleading." Saldana, 260 F.3d at 232.  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The opposing party must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  Issues

of fact are "genuine only if a reasonable jury, considering the evidence presented, could find for the nonmoving party." Childers v. Joseph, 842 F.2d 689, 693-94 (3d Cir. 1988). Only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment. Id. Unsubstantiated arguments made in briefs are not considered evidence of asserted facts. Versarge v. Township of Clinton, 984 F.2d 1359, 1370 (3d Cir. 1993). Allegations made without any evidentiary support may be disregarded. Jones v. UPS, 214 F.3d 402, 407 (3d Cir. 2000). The court may not consider evidence on a motion for summary judgment that would not be admissible at trial. Pamintuan v. Nanticoke Mem'l Hosp., 192 F.3d 378, 387 n.13 (3d Cir. 1999). Summary judgment must be entered in favor of the moving party "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Matsushita, 475 U.S. at 5887(citations omitted).

IV.     **Discussion**

A.  **Smith's RLUIPA Claim**

Section 3 of RLUIPA provides, in relevant part, that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability," unless the government establishes that the burden furthers "a compelling interest," and does so by the "least restrictive means." 42 U.S.C. § 2000cc-1(a)(1)-(2). RLUIPA defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of

religious belief."  42 U.S.C. § 2000cc-5(7)(A); see also Cutter v. Wilkinson, 544 U.S. 709, 715 (2005).  Attending group services plainly falls within the definition of "religious exercise."  Cf., Small v. Lehman, 98 F.3d 762, 767 (3d Cir.1996) ("an opportunity to worship as a congregation by a substantial number of prisoners may be a basic religious experience and, therefore, a fundamental exercise of religion by a bona fide religious group").

Under RLUIPA, the plaintiff must show that his religious exercise has been burdened substantially by the challenged conduct.  Washington v. Klem, 497 F.3d 272, 277-78 (3d Cir. 2007).  The Third Circuit Court of Appeals has defined the term "substantial burden" in the RLUIPA context as follows:

> 1) a follower is forced to choose between following the precepts of his religion and forfeiting the benefits otherwise generally available to other inmates versus abandoning one of the precepts of his religion in order to receive a benefit; OR 2) the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs.

Id. at 280.  If the plaintiff shows that the prison administrator's action or inaction has imposed a substantial burden on the exercise of the plaintiff's religion, the prison administrator must establish that the challenged conduct furthers a compelling governmental interest and that it is the least restrictive means of furthering that interest.  Id. at 283.

Plaintiff claims that defendants have substantially burdened his exercise of religious practices by denying him the opportunity to attend a weekly Rastafarian service when similar services are available for other religious groups.  Initially, it bears noting that Defendants

have not categorically refused to accommodate the request for prayer services.  Defendants

have indicated that Rastafarian group services could be held if a volunteer prayer leader

offered his or her services, just as services for inmates of other religions have been

accommodated.[5]

Moreover, Defendants have not deprived Smith or other Rastafarians of some

benefit as a consequence of their religious belief or forced him to do something inconsistent

with Rastafarian religious practices.  On the contrary, SCI-Huntingdon Rastafarian inmates are

permitted to have religious books and materials in their cells as long as they comply with the

inmate publications directives.  (DSMF at ¶ 38.)  They are also permitted to pray in their cells

and to follow the tenets of their faith as long as those practices are consistent with the DOC

directives and policies and do not disrupt the order, stability, and security of the institution.

(DSMF at ¶ 39.)  They may also elect to have a personal Religious Advisor worship with them.

(Dkt. Entry 66-2, DC-ADM 819 at R. 17.)  Plaintiff Smith, as well as many other Rastafarian

believers, have been granted an exemption from the DOC hair length requirement in order to

accommodate their faith practices.  (DSMF at ¶ 40 and Dkt. Entry 78-3, Smith Decl. at RR. 2-

---

[5] Pursuant to DC-ADM 819, Religious Activities, only a chaplain or outside religious
leader may conduct religious services within the prison, absent extraordinary circumstances.
An inmate is generally prohibited from leading religious services as it would allow the inmate to
exercise power or control over other inmates, which could jeopardize prison security.  (DSMF at
¶4; Dkt. Entry 66-2, Exh. A, Klemm Decl. at ¶¶ 6 - 8.)

3.)[6]  Thus, it cannot be said that Smith has been "forced to choose between following the precepts of his religion and forfeiting the benefits otherwise generally available to other inmates versus abandoning one of the precepts of his religion in order to receive a benefit." Washington, 497 F.3d at 280.  Nor do the circumstances of this case suggest that the DOC "puts substantial pressure on an adherent [of the Rastafarian religion] to substantially modify his behavior and to violate his beliefs."  Id.  Stated otherwise, this is not a case where the prison administrators are forcing Smith to do something that conflicts with the practice of his religious beliefs.  While the DOC is not providing weekly services, their refusal to do so at DOC expense is a consequence of the inadequate demand for such services.

        Courts have generally rejected the notion that, under RLUIPA, prison administrators must afford group services whenever one or a small number of inmates request them.  For example, in Adkins v. Kaspar, 393 F.3d 559 (5th Cir. 2004), cert. denied, 545 U.S. 1104 (2005), cited approvingly in Washington, 497 F.3d at 280 n.7, an inmate who was a member of the Yahweh Evangelical Assembly (YEA) contended that prison administrators imposed a substantial burden on his religious exercise by not accommodating his request to congregate with other YEA members.  The court rejected his claim because the inability to

---

        [6] Notably, although Smith has asserted that 48 SCI-Huntingdon inmates have obtained exemptions from hair length regulations and 27 additional inmates have hair length accommodation forms pending based on their adherence to Rastafarian beliefs, (Exhibits in Opp. to S. J. Mot.,Dkt. Entry 78-3), the evidence he has presented shows, at best, only 7 inmates requesting group religious services.

congregate was not due to some prison rule, but because of the absence of volunteer ministers

of that faith.  The court concluded that "[t]he requirement of an outside volunteer –  which is a

uniform requirement for all religious assemblies at Coffield with the exception of Muslims –

does not place a substantial burden on Adkins's religious exercise."  Adkins, 393 F.3d at 571.

The Court of Appeals for the Fifth Circuit reaffirmed this conclusion in Baranowski

v. Hart, 486 F.3d 112 (5th Cir.), cert. denied, 128 S.Ct. 707 (2007), which involved a Jewish

inmate's claim that his religious exercise had been burdened by the failure of prison

administrators to take steps to assure group services.  In rejecting the claim, the court stated:

> We first consider whether Baranowski's religious exercise was
> substantially burdened when he was prevented from congregating
> with other Jewish inmates on many Sabbath and Jewish holy days.
> The uncontroverted summary judgment evidence shows that on
> the days Baranowski claims that services were not provided, no
> rabbi or approved religious volunteer was available to lead the
> services. This court considered a similar claim under RLUIPA in
> Adkins; the plaintiff in that case was prevented from gathering with
> other YEA members for various religious observances. We
> explained that the plaintiff and other YEA members were not
> prevented from congregating by prison policy but by the dearth of
> clergy and authorized volunteers.  We held that the requirement of
> an outside volunteer did not place a substantial burden on the
> plaintiff's religious exercise under RLUIPA. In light of this court's
> decision in Adkins and the summary judgment evidence before us,
> we are convinced that the acts of Defendants regarding religious
> services have not placed a substantial burden on Baranowski's
> free exercise of his Jewish faith, within the contemplation of
> RLUIPA.

Id. at 124-25.  See also Searcy v. Broome, C/A No. 6:07-CV-0154, 2007 WL 4443062, *10 (D.

S.C., Dec. 14, 2007) (failure to provide separate worship service for Mennonite inmate did not

substantially burden inmate's religious exercise); Muhammad v. City of New York Dept. of Corrections, 904 F. Supp. 161, 189-91 (S.D. N.Y. 1995) (failure to provide separate worship services for Nation of Islam inmate did not substantially burden his free exercise of religion), app. dismissed, 126 f.3d 119 (2d Cir. 1997).

What was written by Judge Aldisert nearly forty years ago in the context of a free exercise claim remains applicable in the context of this RLUIPA claim:

> The requirement that a state interpose no unreasonable barriers to the free exercise of an inmate's religion cannot be equated with the suggestion that the state has an affirmative duty to provide, furnish, or supply every inmate with a clergyman or religious services of his choice.

Gittlemacker v. Prasse, 428 F.2d 1, 4 (3d Cir. 1970).  At least where, as here, there are only a few inmates who have expressed an interest in group services for a particular religion, the state does not impose a substantial burden on religious exercise by refusing to provide at taxpayer expense an appropriate leader for such services.[7]

It is true that in Small v. Lehman, 98 F.3d 762, 767 (3d Cir. 1996), the court recognized that there may be an affirmative duty to provide the facilities and persons for conducting services where "a substantial number of prisoners" seek to gather for prayer services.  Here, a substantial number of Rastafarians at SCI-Huntingdon have not requested weekly group services.  The affidavits tendered by Plaintiff confirm this fact.  The prison

---

[7] Smith does not dispute the DOC's valid security concerns that prohibit inmates from leading other inmates in worship, and thus, a religious leader is necessary for the establishment of weekly group Rastafarian services.

administrators' decision is rationally based on the number of inmates submitting requests to congregate under a prayer leader.  Less than ten have done so at SCI-Huntingdon over a several year period.  The fact that several times that number of inmates have submitted requests to be exempted from hair length regulations belies any suggestion of reticence on the part of inmates to use the appropriate means to secure accommodation of religious practices. There is no evidence that SCI-Huntingdon officials have placed a blanket ban on the establishment of group Rastafarian services.  To the contrary, the DOC has presented evidence that, were a sufficient number of Rastafarian inmates to follow DC-ADM 819 and express an interest in weekly group services, depending on the size of the interested group, the DOC would either hire a chaplain or screen the suitability of a proposed volunteer religious leader suggested by the Rastafarian community. Under these circumstances, it cannot be said that Defendants are responsible for imposing a substantial burden on the free exercise of Plaintiff's religious practices.

Even if the failure to cover the cost of a religious leader can be said to impose a substantial burden on religious exercise, Defendants have shown both a compelling governmental interest for their refusal and that the applicable policy of not paying for services for a few inmates is the least restrictive means of advancing that interest.  Defendants justifiably articulate a substantial concern that paying a Rastafarian leader to come to SCI-Huntingdon would set an unaffordable precedent of providing religious leaders for all faiths regardless of the number of practicing congregants at the facility.  The undisputed record

-13-

shows that the DOC does not compensate volunteer religious leaders who conduct spiritual

services at the prison for small groups.  Moreover, to pay Bishop Foxe's travel expenses,

however insignificant they may be, and not the travel expenses of other similarly situated

volunteer religious leaders, could imply that the Rastafarian population is favored by the facility

over other religious groups, a perception that could have a significant negative impact on prison

morale and order.

Although Congress intended that RLUIPA be construed "in favor of broad

protection of religious exercise," see 42 U.S.C. § 2000cc-3(g), Congress also "anticipated that

courts would apply the Act's standard with 'due deference to the experience and expertise of

prison and jail administrators in establishing necessary regulations and procedures to maintain

good order, security and discipline, consistent with consideration of costs and limited

resources.'" Cutter, 544 U.S. at 723 (emphasis added).  Congress indicated that in the event

an inmate's request for religious accommodation would "become excessive, impose unjustified

burdens on other institutionalized persons, or jeopardize the effective functioning of an

institution, the facility would be free to resist the imposition." Id. at 726.

In Izquierdo v. Crawford, No. 1:05CV192, 2007 WL 2873210 (E.D. Mo. Sept. 26,

2007), plaintiff claimed that RLUIPA was violated by the Missouri Department of Corrections'

refusal to provide religious services for Shiite Muslims separate from those offered Muslims in

general.  Judge Catherine D. Perry found that the cost and security concerns articulated here

were sufficient to justify the prison administrators' decision under RLUIPA, explaining:

Defendants have shown that there would be an enormous administrative burden if MDOC were required to accommodate the individualized religious beliefs or religious sects of all inmates. This type of concern has been found sufficient in other cases. See Thunderhorse v. Pierce, 418 F. Supp. 2d 875 (E.D. Tex. 2006) (holding that a prison "cannot be expected to provide separate religious services for seven different branches of a religious faith ... nor does the law require that such be provided); Muhammad v. City of New York Department of Corrections, 904 F.Supp. 161, 195 (S.D. N.Y.1995) (RFRA not violated by prison's decision not to provide separate group worship for Nation of Islam inmates).

The defendants have also shown that the prison security could be harmed if they showed favoritism to one religious group, such as by providing sect-specific services for Muslims when they do not do so for Christians. Cf. Adkins v. Kaspar, 393 F.3d 559, 565 (5th Cir .2004) (finding that if a member of one small religious sect were accommodated and other small religious groups were not, the accommodated group "could appear to be favored over the others, a perception that could have a negative effect on prison morale and discipline"). Institutional security is "the most compelling government interest in a prison setting." Goff v. Graves, 362 F.3d 543, 549 (8th Cir.2004). See also Pell v. Procunier, 417 U .S. 817, 823 (1974) (holding that "central to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves").

Defendants have thus shown that they are entitled to summary judgment on plaintiff's RLUIPA claim for two different reasons: the undisputed facts show no substantial burden on Izquierdo's exercise of religion, and defendants' actions are the least restrictive means to further a compelling government interest regardless of the number of inmates attending the services

Id. at *6-7.

This reasoning applies with equal force here.  Cost and security issues provide

the appropriate compelling governmental interest, and the even-handed approach followed by

the DOC in addressing requests for group religious services is the least restrictive means available to protect the government's interests.

In sum, Smith has not produced evidence that more than 6 other SCI-Huntingdon Rastafarian inmates have requested weekly communal Rastafarian services. Such a small number of inmates does not warrant or mandate the provision of a religious leader at DOC expense. Smith may still seek the volunteer services of a religious leader in order to establish group Rastafarian services at SCI-Huntingdon. Thus, the uncontroverted summary judgment evidence shows that Smith has failed to present prima facie evidence that defendants have "substantially burdened" the practice of his religion. However, assuming that the denial of weekly communal Rastafarian services in and of itself is a substantial burden on Smith's religion, the undisputed evidence compels a finding that the DOC neutral policy of accommodation of requests for group religious service represents the "least restrictive means" of protecting the compelling governmental interests of managing limited financial resources and assuring the security of the institution. As no RLUIPA violation has been shown, defendants are entitled to summary judgment.

### B. Smith's First Amendment Claim.

Prisoners retain the First Amendment right to a reasonable opportunity to exercise their religious beliefs. Cruz v. Beto, 405 U.S. 319, 322 (1972); DeHart v. Horn, 227 F.3d 47, 50 (3d Cir. 2000). However, reasonable opportunities do not extend to every religion-related demand that could be made by a prisoner. Cruz., 405 U.S. at 322, n. 2.

Certain restrictions are justified by the valid penological objectives of deterrence of crime, rehabilitation of prisoners, and institutional security.  DeHart, 227 F.3d at 50-51.

To establish a free exercise violation, the inmate must show that the defendants burdened the practice of his religion by preventing him from engaging in conduct mandated by his faith without any justification reasonably related to legitimate penological interests.  See Turner v. Safley, 482 U.S. 78, 89 (1987).  The reasonableness of government action impacting a prisoner's constitutional rights is determined by considering the following four factors: (1) whether there is a valid, rational connection between the governmental action and a legitimate governmental interest; (2) whether there are alternative means of exercising the constitutional right that remains open to prison inmates; (3) what impact an accommodation of the asserted constitutional right will have on guards and other inmates and on the allocation of prison resources generally; and (4) whether ready alternatives exist for accommodating the prisoners' right at de minimis costs to valid penological interests.  Id., 482 U.S. at 89-90, 107 S.Ct. at 2262.

The decision to deny Smith weekly group Rastafarian services at SCI-Huntingdon passes constitutional muster under the Turner factors.  As noted above, no more than 7 inmates have requested weekly communal Rastafarian services.  The few Rastafarians that have requested group Rastafarian services have failed to present or suggest an acceptable volunteer religious leader to lead them.  The DOC has explained why it cannot pay the travel expenses of a Rastafarian leader when it does not compensate other volunteers for their

expenses.  Smith also does not dispute that he has alternative means of exercising his religion.

He, and other, Rastafarian inmates have obtained hair length exemptions, they are permitted

individual visits by  Religious Advisors, and may pray as they wish individually and may obtain

and posses religious books and materials in their cells.  The summary judgment record

demonstrates that the DOC policy for determining which religious groups will be provided

chaplains based on the number of individuals who wish to attend a service is logically

connected to legitimate penological concerns of establishing a facially neutral means for

allocating limited prison resources, such as funds, staffing and space.  Smith does not dispute

that weekly Rastafarian services cannot be held without either a hired or volunteer religious

advisor as it would be inappropriate and contrary to legitimate security concerns to allow

inmates to lead such religious services.  Accordingly, the denial of Smith's request for a weekly

Rastafarian service does not violate the First Amendment.

### C.  Fourteenth Amendment Equal Protection Claim.

"The Equal Protection Clause ... is essentially a direction that all persons similarly

situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432

(1985).  The Third Circuit has observed that the Equal Protection Clause "is not a command

that all persons be treated alike but, rather, 'a direction that all persons *similarly situated* should

be treated alike.' " Artway v. Attorney Gen., 81 F.3d 1235, 1267 (3d Cir.1996) (quoting City of

Cleburne, 473 U.S. at 439 (emphasis in original).  "Treatment of dissimilarly situated persons in

a dissimilar manner by the government does not violate the Equal Protection Clause." Klinger

v. Department of Corrections, 31 F.3d 727, 731 (8th Cir. 1994).

Smith must therefore show that he was similarly situated to, and treated differently than, other inmates requesting religious group meetings.  Although Smith contends other religious groups are permitted weekly group services, he has failed to come forward and offer any evidence in support of his allegation that another inmate group seeking to establish weekly communal services was permitted such services without demonstrating a sufficient number of inmates via DC-ADM 819.  Likewise, he has not shown that any volunteer spiritual leader is being reimbursed for his/her travel or other expenses by the DOC.  There is no evidence to suggest that the SCI-Huntingdon Rastafarian population has been required to follow any regulations, or encountered any impediments, that other smaller religious groups (for example Jehovah Witnesses, Buddhists, or Messianic Jews) had not encountered in securing weekly religious services.  Accordingly, the court will grant defendants' motion for summary judgment with respect to the equal protection claim.

## V.    Conclusion

For the foregoing reasons, the Court will grant the motion for summary judgment. An appropriate order will issue.

                              **s/ Thomas I. Vanaskie**
                              Thomas I. Vanaskie
                              United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ROBERT T. SMITH,** | : | |
| | : | |
| **Plaintiff** | : | |
| | : | **CIVIL NO. 1:CV-03-0898** |
| **vs.** | : | |
| | : | **(CHIEF JUDGE VANASKIE)** |
| **KENNETH KYLER, <u>et</u> <u>al.</u>,** | : | |
| | : | |
| **Defendants** | : | |

**O R D E R**

**NOW**, this **20th** day of **FEBRUARY, 2007,** for the reasons set forth in the foregoing

Memorandum, **IT IS HEREBY ORDERED THAT:**

1.  Defendants' Motion for Summary Judgment (Dkt. Entry 57) is **GRANTED**.

2.  The Clerk of Court is directed to enter judgment in favor of all Defendants and to mark this matter **CLOSED.**

<u>s/ Thomas I. Vanaskie</u>
Thomas I. Vanaskie
United States District Judge